UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESIGHINI RANCHERIA, *et al.*, | No. C-11-6710 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| CHARLTON H. BONHAM, individually and in his official capacity as Director of the California Department of Fish and Game, | **(Docket No. 11)** |
| Defendant. | |

Plaintiffs are Resighini Rancheria, a federally recognized Indian tribe, and two of its members, Gary Dowd and Frank Dowd. They have filed suit against Defendant Charlton H. Bonham, both in his individual capacity and in his official capacity as the director of the California Department of Fish and Game ("DF&G"). Essentially, Plaintiffs seek a declaration that they are entitled to fish on the Klamath River within the old Klamath River Reservation/Extension and an injunction barring the DF&G from citing members of the tribe for fishing in that area. Mr. Bonham has moved to dismiss, arguing that Plaintiffs have no standing to sue.

## I. FACTUAL & PROCEDURAL BACKGROUND

As indicated above, Plaintiffs basically want to be able to fish on the Klamath River within the old Klamath River Reservation/Extension without being cited. The area where Plaintiffs want to fish is not within the Resighini Reservation but rather within the reservation of another Indian tribe, *i.e.*, the Yurok Tribe.

The evidence of record indicates that action was taken against both Gary Dowd and Frank Dowd for fishing in that area. That action, however, was not taken by DF&G but rather by Yurok police officers – Josh Davis and Thorin McCovey – who are also cross-deputized as Del Norte County sheriffs. *See* Docket No. 11 (McQuillen Decl. ¶¶ 3-4) (testifying that individuals are Yurok police officers); Docket No. 11 (Banko Decl. ¶¶ 4-6) (testifying that individuals are also cross-deputized as Del Norte County sheriffs but are not employed by DF&G).

More specifically, on August 29, 2010, the Yurok Police Department seized fishing equipment owned by Gary Dowd. The Yurok Police Department offense/incident report, prepared by Officer Davis, indicated that Gary Dowd had violated both tribal ordinances (the Yurok Harvest Management Plan) and the California Fish & Game Code.[1] It appears that Officer Davis forwarded the information to both the Yurok Tribal Court and the Del Norte County District Attorney's Office. *See* Docket No. 11 (McQuillen Decl., Ex. A) (offense/incident report).

Approximately a year later, on September 16, 2011, the Yurok Department of Public Safety issued a notice to appear to Frank Dowd. The notice, which was filled out by Officer McCovey, stated that Frank Dowd was an "ineligible fisher," had "no tribal I.D.," and had violated the California Fish & Game Code.[2] The notice directed Frank Dowd to appear before the Del Norte Superior Court. *See* Docket No. 12 (Frank Dowd Decl., Ex. A) (notice). Prior to the appearance, the Del Norte District Attorney's Office decided not to pursue a case against Frank Dowd because there was insufficient evidence to prove that the crime had occurred." Docket No. 12 (Marston Decl., Ex. A) (disposition document).

A few weeks before the incident involving Frank Dowd, Lester Marston, general counsel for the Resighini Tribe (and also litigation counsel of record) sent a letter to John McCamman, then-Director of DF&G, asserting that, "[r]ecently, California Fish and Game wardens cited members of the Tribe for fishing on areas of the Klamath River not within the boundaries of the [Resighini]

---

[1] *See* Cal. Fish & Game Code § 8685.5 (providing that, "[n]otwithstanding any other provision of law, gill nets may not be used to take salmon, steelhead, or striped bass").

[2] *See* Cal. Fish & Game Code § 2000 (providing in relevant part that "[i]t is unlawful to take any bird, mammal, fish, reptile, or amphibian except as provided in this code or regulations made pursuant thereto").

2

Reservation, but within the boundaries of the Old Klamath River Reservation." Docket No. 12 (Marston Decl., Ex. B) (letter). Mr. Marston asked the Director to "instruct all [DF&G] officers that [DF&G] has no jurisdiction to enforce the Fish and Game Code against members of the [Resighini] Tribe fishing within the Indian country created by the establishment of the Klamath River Reservation." Docket No. 12 (Marston Decl., Ex. B) (letter). Mr. Marson also asked the Director to advise "whether State Game Wardens will be enforcing the State's Fish and Game Code against members of the [Resighini] Tribe while fishing within that portion of the Klamath River lying within the boundaries of the Klamath River Reservation." Docket No. 12 (Marston Decl., Ex. B) (letter).

A few weeks after the Frank Dowd incident was resolved, general counsel for the DF&G responded to Mr. Marston's letter. General counsel stated that, back in 2008 DF&G had been contacted by the Yurok Tribe about

> similar assertions by members of the Resighini Rancheria. The Yurok were concerned because salmon are fully allocated among the Yurok and Hoopa Tribes and non-Indian fishing interests pursuant to the Magnuson Act (16 U.S.C. §§ 1801, 1851), and the Yurok did not want the Resighini's take of fish to be counted against the Yurok tribal allotment.
>
> The [DF&G] consulted with the Office of the Attorney General and concluded the Resighini Rancheria and its members do not have any aboriginal or reserved rights to fish in the Klamath River. The 1988 Hoopa-Yurok Settlement Act (Settlement Act), which partitioned the former joint reservation into the Yurok Reservation and the Hoopa Valley Reservation, expressly excluded the Resighini Reservation from the new Yurok Reservation unless the Rancheria voted to extinguish their tribe and their reservation and become part of the Yurok Reservation. The Resighini Rancheria declined to merge with the Yurok Tribe under section 11(b) of the Settlement Act, and instead opted to accept section 6(d) individual lump sum payments. As a result, only current members of the Yurok Tribe are beneficiaries of the reserved fishing rights that attach to the present day Yurok Reservation.
>
> While the [DF&G] generally does not have authority to enforce state fishing regulations against Indians on their own reservations, the [DF&G] may criminally enforce the Fish and Game Code against Resighini members on the Yurok Reservation in the same manner as it regulates non-Indian fishing on the reservation.

Docket No. 12 (Marston Decl., Ex. C).

A few months later, Plaintiffs initiated the case at bar.

3

## II. DISCUSSION

A. Legal Standard

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471-72, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982).

*Bennett v.* Spear, 520 U.S. 154, 162 (1997). Moreover, as explained by the Ninth Circuit, the

> case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, *inter alia*, that plaintiffs have standing and that claims be "ripe" for adjudication. . . . Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication. The related doctrine of ripeness is a means by which federal courts may dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur. Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss.

*Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-22 (9th Cir. 2010).

Article III standing must be established whether the relief sought is injunctive or declaratory. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152-56 (9th Circ. 2000) (analyzing standing to seek injunctive and declaratory relief in same way regarding injury in fact); *Virginia Sur. Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1246 (9th Circ. 1998) (stating that, "'[w]here only injunctive or declaratory relief is sought, a plaintiff must show a very significant possibility of future harm in order to have standing to bring suit'").

"A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Where a factual motion to dismiss is made and only written materials are submitted for the court's consideration (*i.e.*, no hearing is held), a plaintiff need only establish a

4

prima facie case of jurisdiction. *See Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 942 (9th Cir. 1985).

B. <u>Standing v. Ripeness</u>

As a preliminary matter, the Court notes that Mr. Bonham has formally offered an argument based on standing only. However, as indicated above, standing and ripeness are related doctrines, *see also Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (noting that "[t]he constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides with standing's injury in fact prong"), and so it is not prejudicial for the Court to entertain both issues, particularly because Plaintiffs themselves acknowledge in their opposition the argument of ripeness. *See* Opp'n at 2 (stating that "Bonham frames his subject matter jurisdiction inquiry as a standing issue when it is actually a ripeness issue").

C. <u>Standing Based on Actions Taken by Officers Davis and McCovey</u>

There should be no real dispute that DF&G has the authority to enforce the provisions of the California Fish & Game Code.[3] Section 850 of the Code gives the Director of DF&G the authority to "employ or appoint . . . such deputies, clerks, assistants, and other employees as the department may need to discharge in proper manner the duties imposed upon it by law." Cal. Fish & Game Code § 850. Section 851 provides that

> [a] deputy appointed to enforce the provisions of this code is a peace officer. He has all the powers and authority conferred by law upon peace officers listed in Section 830.3 of the Penal Code to make arrests for violations of this code, and may serve all processes and notices throughout the state.

Cal. Fish & Game Code § 851; *cf. National Audubon Soc'y v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) (stating that the Eleventh Amendment does not bar a suit against the director of DF&G, who

---

[3] *Cf. Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (noting that, under *Ex Parte Young*, a state officer who is sued "'must have some connection with the enforcement of the [allegedly unconstitutional] act'"; adding that the "connection must be fairly direct" and that "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit"); *see also Snoeck v. Brussa*, 153 F.3d 984, 985-87 (9th Cir. 1998) (applying the rule).

has direct authority over and principal responsibility for enforcing Proposition 4, *i.e.*, California Fish & Game §§ 3003.1 and 3003.2)

The problem for Plaintiffs is that there is no evidence that any injury to Plaintiffs was caused by or fairly traceable to DF&G. *See Lujan*, 504 U.S. at 560 (noting that one element of standing is that "there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court"). There is no evidence in the record that any DF&G deputy, or any other DF&G employee, took any action against the Resighini Tribe or its members for fishing in the area at issue. As indicated above, Officer Davis, who was involved in the Gary Dowd incident, is an employee of the Yurok Police Department. So too is Officer McCovey. While both officers appear to be cross-deputized as Del Norte County sheriffs, and thus they may qualify as state actors for purposes of, *e.g.*, 42 U.S.C. § 1983, that does not mean that they are agents of DF&G (a state agency), that DF&G has control over them, and/or that they were acting at the behest of DF&G.

In their opposition, Plaintiffs suggest that the Yurok police officers had to have been given the "go ahead" by DF&G to act. They argue:

> As stated in the Letter [from general counsel for DF&G to Mr. Marston, Plaintiffs' counsel], the [DF&G] determined that the [Resighini] Tribe does not have right to fish on the Klamath River. Unless the [DF&G] had determined that the [Resighini] Tribe may not fish legally on the Klamath River, the State-deputized Yurok Tribal Police Officers would not be authorized to enforce Cal. Fish & G[ame] Code §§ 2000 and 8664 against members of the [Resighini] Tribe.

Opp'n at 4. But even if the DF&G determined back in 2008 that the Resighini Tribe members were not entitled to fish in the area at issue, that does not necessarily mean that DF&G instructed, approved, or otherwise directed the Yurok police officers who were cross-deputized as *county* sheriffs (and not as officers of DF&G) to take action against Resighini Tribe members.

Plaintiffs contend that, even if DF&G did not give the "go ahead" to act, it can still be accountable under *Bennett v. Spear*, 520 U.S. 154 (1997). *See* Opp'n at 5. However, *Bennett* is distinguishable. In *Bennett*, a federal agency, the Bureau of Reclamation, contacted the U.S. Fish & Wildlife Service ("F&W") because a proposed irrigation project might affect two endangered

6

species of fish. F&W issued a Biological Opinion, concluding that the proposed long-term operation of the project was likely to jeopardize the species and identifying as a reasonable and prudent alternative the maintenance of minimum water levels on certain reservoirs. The agency notified F&W that it would operate the project in compliance with the Biological Opinion. Subsequently, irrigation districts receiving project water and operators of ranches in those districts filed suit against, *inter alia*, F&W, claiming that the jeopardy determination and imposition of minimum water levels violated certain provisions of the Endangered Species Act.

On appeal, F&W argued that "any injury suffered by petitioners is neither 'fairly traceable' to the [F&W's] Biological Opinion . . . because the 'action agency' (the Bureau) retains ultimate responsibility for determining whether and how a proposed action shall go forward." *Id.* at 168. The Supreme Court disagreed, stating:

> This wrongly equates injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is "'the result [of] the independent action of some third party not before the court,'" that does not exclude injury produced by determinative or coercive effect upon the action of someone else.

*Id.* at 168-69. The court went on to explain that, even though F&W's Biological Opinion was technically advisory in nature, in reality it had a "powerful coercive effect" on agency action. *Id.* at 169. First, an "agency that chooses to deviate from the recommendations contained in a biological opinion bears the burden of articulating in its administrative record its reasons for disagreeing with the conclusions of a biological opinion.'" *Id.* (internal quotation marks omitted). Second,

> [a] Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject. When it "offers reasonable and prudent alternatives" to the proposed action, a Biological Opinion must include a so-called "Incidental Take Statement" – a written statement specifying, among other things, those "measures that the [F&W] considers necessary or appropriate to minimize [the action's impact on the affected species]" and the "terms and conditions . . . that must be complied with by the Federal agency . . . to implement [such] measures." Any taking that is in compliance with these terms and conditions "shall not be considered to be a prohibited taking of the species concerned." Thus, the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to "take" the endangered or threatened species so long as it respects the Service's "terms and conditions." The action agency is technically free to disregard the Biological Opinion and proceed with its proposed

7

> action, but it does so at its own peril (and that of its employees), for "any person" who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.

*Id.* at 169-70.

In contrast to *Bennett*, there is nothing in the record before the Court to suggest that the DF&G's determination that the Resighini Tribe members cannot fish in the area at issue had a "determined or coercive effect upon" (*id.* at 169) the Yurok police officers in taking action against the Resighini Tribe members. Plaintiffs have not alleged or demonstrated that the DF&G's legal determination (discussed in greater detail below) "alters the legal regime" (*id.*) to which the Yurok police officers are subject. Unlike the Biological Opinion, there is no showing that DF&G's legal opinion affected potential liability of the Yurok's police officers or their agency. Nothing suggests these officers would suffer a legal disadvantage resulting from the DF&G opinion were they to contravene the DF&G's advisory and not enforce fishing laws against the Resighini Tribe. In short, as alleged, the Yurok police officers' actions are not "fairly traceable" to the DF&G.

Finally, to the extent the Resighini Tribe's counsel, Mr. Marston, in his letter to DF&G claimed that members of the tribe had been cited by DF&G wardens, there are no allegations or evidence in the record to support that claim.

D.   <u>Standing and/or Ripeness Based on DF&G Responsive Letter</u>

While DF&G cannot be held accountable for the actions taken by the cross-deputized Yurok police officers, as noted above, DF&G's own general counsel stated in a letter to counsel for the Resighini Tribe (Mr. Marston) that, "[w]hile the [DF&G] generally does not have authority to enforce state fishing regulations against Indians on their own reservations, the [DF&G] may criminally enforce the Fish and Game Code against Resighini members on the Yurok Reservation in the same manner as it regulates non-Indian fishing on the reservation." Docket No. 12 (Marston Decl., Ex. C) (letter). While Plaintiffs contend this letter provides standing to sue the DF&G, there is again, a causation problem.

DF&G argues that this action is not enough of a threat to establish a case or controversy because the letter simply advised Mr. Marston as to what DF&G's understanding of the law was.

8

DF&G suggests that a statement that it *has* the authority to enforce fishing regulations against the Resighini Tribe members for fishing in the area at issue does not establish that DF&G *will* – or is even likely to – enforce the fishing regulations against Plaintiffs. This argument may be viewed under the lens of either standing or ripeness. *See Thomas*, 220 F.3d at 1139 (noting that, "in 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing'").

In *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), the Supreme Court set forth the following standard for Article III standing based on a threat of prosecution:

> When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, *and there exists a credible threat of prosecution thereunder*, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

*Id.* at 298 (emphasis added). The Ninth Circuit has held:

> [i]n evaluating the genuineness of a claimed threat of prosecution, [a court should] look to whether the plaintiffs have articulated a "concrete plan" to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute.

*Thomas*, 220 F.3d at 1139.

In the instant case, Plaintiffs have failed to make the requisite showing of a "credible threat of prosecution" by DF&G. First, the letter acknowledges "the [DF&G] generally does not have authority to enforce state fishing regulations against Indians on their own reservations." Docket No. 12 (Marston Decl., Ex. C) (letter). Second, Plaintiffs have provided no evidence of a history of past prosecution or enforcement by DF&G specifically, as opposed to the Yurok Tribe and/or Del Norte County. Third, the statement by DF&G's general counsel in the letter does not constitute a specific warning or threat to initiate proceedings. The statement does not establish the requisite degree of specificity or likelihood of enforcement.

As examples of sufficiently specific threats, the Ninth Circuit has pointed to

> *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (First Amendment case) (plaintiff was warned twice to stop handbilling and was told by police that he would *likely* be prosecuted if he handbilled again at the

9

> shopping center); *Ripplinger v. Collins*, 868 F.2d 1043, 1047 (9th Cir. 1989) (First Amendment case) (deputy county attorney warned plaintiff that an obscenity charge *would* be initiated if he continued to distribute "hardcore pornography")[;]

*San Diego County Gun Rights*, 98 F.3d at 1127 (emphasis added); and

> *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 616, 618 (9th Cir. 1999) (per curiam) (plaintiff had established injury in fact under a Nevada statute when the attorney general wrote a "precise and exact" letter to the union which quoted the statute in full and threatened to refer the prosecution to "local criminal authorities").

*Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2011).

    In contrast, in *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1 (9th Cir. 1974), the Ninth Circuit found that a threat was not sufficiently specific. In *Rincon*, the plaintiff Indian tribe sought declaratory and injunctive relief to bar the enforcement of a San Diego gambling ordinance on its reservation. Prior to filing suit, the tribe's attorneys sent a letter to counsel for San Diego County in which they "alleged that several members of the [tribe] were informed by representatives of the San Diego County Sheriff's Department that under the county gambling ordinance all gambling in unincorporated areas of the county was illegal and that the ordinance would be enforced against persons on the [tribe's] Reservation." *Id.* at 4. In the same letter – as well as in a subsequent correspondence – the tribe's attorneys asked for a written statement of the county policy as to the county's jurisdiction to enforce its gambling ordinance on the tribe's reservation. *See id.* In response, the county sheriff replied that "'State law, as well as the County ordinance, is quite specific relative to gambling, and all of the laws of San Diego, State, Federal and County will be enforced within our jurisdiction.'" *Id.* The sheriff added: "'[W]e felt that the laws of the State and the County are not made for a few, but meant to include everyone, and they shall be administered in that manner.'" *Id.* The Ninth Circuit characterized the sheriff's response as a general threat, which lacked the specificity and immediacy necessary to give rise to a justiciable case or controversy. *See also San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (emphasizing that "a general threat of prosecution is not enough").

    In the case at bar, the statement by DF&G's counsel is admittedly more specific than that made by the sheriff in *Rincon*, but on the spectrum, is closer to *Rincon* than those cases finding

1  sufficiently specific threats of prosecution to satisfy Article III.  As noted above, the general counsel
2  simply indicated that DF&G had the authority to enforce the fishing regulations against the
3  Resighini Tribe members.  Importantly, in contrast to cases where a credible threat of prosecution
4  was found, general counsel did not state that the fishing regulations "would be" enforced; nor did he
5  even say that the regulations would "likely" be enforced.  Plaintiffs have failed to cite to any
6  authority holding that the mere possibility of enforcement is sufficient to establish standing.

*Montana Shooting Sports Association v. Holder*, No. CV-09-147-DWM-JCL, 2010 U.S. Dist. LEXIS 104301 (D. Mt. Aug. 31, 2010), adopted by 2010 U.S. Dist. LEXIS 104286 (D. Mt. Sept. 29, 2010), is an analogous case.  There, the plaintiffs brought a declaratory judgment action asking for a determination that they could manufacture and sell firearms under the Montana Firearms Freedom Act (then-recently enacted) without complying with federal firearms laws.  Prior to filing suit, one of the plaintiffs wrote to the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") asking for guidance on the issue.

> The ATF responded by letter . . . identifying various requirements under federal firearms laws.  The ATF [also] cautioned [the plaintiff] that a violation of the [federal] Gun Control Act or the National Firearms Act "could lead to . . . potential criminal prosecution."  In closing, the ATF stated once again that to the extent "the Montana Firearms Freedom Act conflicts with Federal firearms laws and regulations, Federal law supersedes the Act, and all provisions of the [Gun Control Act] and [National Firearms Act], and their corresponding regulations, continue to apply."

*Id.* at *5; *see also id.* at *37 (quoting another part of ATF letter, which stated "'that any unlicensed manufacturing of weapons or ammunition for sale or resale, or the manufacture of any [National Firearms Act] weapons, . . . without proper registration and payment of tax, is a violation of Federal law and could lead to the forfeiture of such items and potential prosecution under [federal law]").  Before the district court, the plaintiff argued that there was a specific threat of prosecution based on the ATF letter discussed above.  The court disagreed, explaining that the statement that certain conduct could lead to the forfeiture of weapons or ammunition and potential prosecution  "amounts to nothing more than a general assertion that anyone who violates the nation's federal firearms statutes may be subject to criminal prosecution.  Such a general statement is not a specific threat of an imminent intent to prosecute [the plaintiff] . . . ." *Id.* at *38.

### III. CONCLUSION

For the foregoing reasons, the Court grants Mr. Bonham's motion to dismiss for lack of subject matter jurisdiction. Mr. Bonham has made a factual challenge, and Plaintiffs have failed to make a prima facie showing that there is a case or controversy under Article III. For example, they have not shown that prior enforcement actions by cross-deputized Yurok police officers against Resighini Tribe members is fairly traceable to the DF&G. Furthermore, the letter from DF&G's general counsel does not constitute a credible threat of prosecution. Because the Court grants DF&G's motion, Plaintiffs' motion for summary judgment against DF&G is moot.

The dismissal of DF&G shall be without prejudice. At the hearing, Plaintiffs asked for leave to amend to sue additional defendants – *e.g.*, the Del Norte County sheriff. Mr. Bonham does not dispute that the sheriff may be a proper defendant. Plaintiffs should also be given an opportunity to amend to establish Article III standing against DF&G. The Court therefore grants Plaintiffs' request to amend. Plaintiffs shall have thirty days from the date of this order to file an amended complaint. If the case proceeds against the new defendant to the discovery phase, then the Court shall give Plaintiffs some leeway in discovery so as to investigate whether, *e.g.*, DF&G instructed or encouraged the sheriff to enforce the regulations against the members of the Resighini Rancheria. Such discovery should be narrowly tailored.

This order disposes of Docket No. 11.

IT IS SO ORDERED.

Dated: May 31, 2012

_____
EDWARD M. CHEN
United States District Judge